on behalf of Mr. Loughner. This appeal presents two issues. First, whether the ongoing forced medication regime of Mr. Loughner with antipsychotics is justified, and what procedures and substantive protections are necessary to ensure that there's not an erroneous deprivation of his right. Second, even if those medications were justified on a dangerousness ground, whether the district court can commit Mr. Loughner for purposes of this appeal to be held accountable for his actions. knowing that those same drugs are a critical aspect of the restoration process, without considering whether side effects of those drugs are substantially likely to render a trial unfair. Is that substantially likely? Is that the one that's a predictive finding? That's correct, Your Honor. That just amazes me to be speculating findings. I'm a little odd in this, and of course it's not your fault. Some other people write that stuff. How do you get there? I understand a finding of fact, but I don't understand what a predictive finding would be. What do you have to know, and what's the standard review? Well, I think it helps to understand this by stepping back to how you analyze any due process question. What are the ends that the government intends to seek, in this case a fair trial with respect to competency, and what are the means that they can employ to pursue those ends? I don't think the government has any dispute that the competency statute requires a predictive analysis of whether the individual is likely to become competent in order to further their commitment under D-2A. What's unique about this case is because these forced medications are at play, and because the government has not sought another justification, for instance, under SEL, or subjected Mr. Loughner to civil commitment proceedings where they might attain a right to treatment. Because they're using these forced medications to attain their goal, which is to have a trial, if those forced medications are likely to have side effects that make it impossible to have a fair trial, well then the court necessarily has to consider this. I understand that argument, but I just don't know what the government would have to show. That is, what does it mean that it's likely, that it's substantially likely, or that it will happen? Would it be based upon evidence of doctors who would do predictions? Is that the way it would go? Well, presumably it would be the same sort of evidence that the government presented at the competency hearing on September 28th. The doctors who are familiar with Mr. Loughner, and maybe with a slight difference. At the hearing on September 28th, Mr. Loughner's treating psychiatrist, the individual who was prescribing the very drugs, the individual who Dr. Pites on several occasions deferred to his judgment and his expertise, he was never called by the government. But I would imagine applying the appropriate standard in this case, someone like that would have to be called to talk about what the side effects are that we're seeing, and what the likely outcome is over the period of treatment that the government seeks. Let's say the government seeks four months or eight months. If they propose a treatment plan that's sufficiently specified, then a doctor could say, over this course of time, perhaps these side effects will exacerbate, or maybe they can be addressed in some other way. But that simply wasn't done. How do you think the two issues that you raised fit together? In other words, does the fact that we are now, when the dangerousness determination was originally made, Loughner had been committed for a four-month period to determine whether he could be restored to competency. So he was there for that four-month period. And the dangerousness determination was made in the context of him being there for that four-month period. Now we have this hearing which is to decide whether he's going to go back for another four-month period. Does that impact how, I understand your position is that the dangerousness hearing always had to be done by a judge, and with a heightened standard and so on. We went over this in the last hearing. But suppose we thought that there were some adjustments to the usual determinations, the dangerousness determinations that would have worked then. Is anything different now? In other words, in the context of this hearing, does the dangerousness determination have to be made judicially and so on, even if it didn't earlier? Well, the question presumes that some procedures, whatever is required by due process, is followed at some point and he's being forcefully medicated. And the question is, at this hearing, is there something else the court has to do? Well, I think the answer would be, first, I think it helps to look at what the district court intuited in several of its pronouncements about whether it needed to have further proceedings. The court, in its own words, said this was a game-changer. When the court orders Mr. Loeffner to be committed for restoration, he is committing Mr. Loeffner knowing that these drugs are being used, and indeed the prison is being ordered to try to treat him, to restore him to competency. It's different than the evaluative phase of commitment. So I think that that is a substantial difference. What would a court have to do at the point of this new commitment to reconsider the drugs? What we've argued is it's a consideration of the effect of these drugs. Assuming that those drugs are appropriate for dangerousness, what is the effect of those drugs on the likelihood of achieving a trial, a fair trial in this case? And that's what the court has to address and what the court didn't adequately address in this case. Can I ask you a question following up on that? It strikes me that there's an alternative, and I want you to tell me why that alternative is a bad idea. That is, if we take a self-test now and run through it, we're going to talk about what might happen. But suppose we go four months and he's restored to be able to try, but the side effects clearly make it. I mean, you can testify that the side effects are going to interfere with his ability to assist counsel. Why wouldn't your due process argument be better made there when dealing with facts where you can show prejudice and where he's not going to come to trial because he can't come to trial without helping counsel? Why wouldn't that be a better way to approach it rather than what you suggest? Well, two reasons. First, because the Supreme Court says you have to do this before you can recommit. That's Jackson v. Indiana. Yeah. But underlying that is the notion that you have to do this. What's the this? I'm sorry. You said the Supreme Court said you have to do this. What's the this? The Supreme Court in Jackson v. Indiana said before you can commit someone for restoration to competency, that there has to be, I think they said, a substantial chance that the individual can be taken to trial. And in the context that we have in this case, you cannot take an individual to trial if there are side effects that are, where there's a substantial chance that they'll prevent him from having a fair trial. So that's what I mean by Jackson. Jackson says you have to do it now before you deprive him of the interest from being recommitted. And I think Vitek v. Jones also underscores this with the commitment. Because Mr. Lochner is being committed. He's being committed not just for an evaluative phase, but for restoration of competency. Setting aside Jackson, say that we can distinguish that, it seems to me that he's going to get a better trial and the government is going to be better served if we're dealing with reality rather than speculation. And the same thing comes out. He doesn't, the government doesn't get to try him. They're trying to restore him. But if the side effects prevent him from assisting counsel, they're going to shoot themselves in the foot. But that's not your problem. That's theirs. The end result, wouldn't he receive just as good a protection or maybe better protection because he'd have the facts to show? He wouldn't because currently he is being sent to be restored to competency, something that he has a right to be free from, not just the forced medications, but the restoration efforts made by the prison itself. This is where I have a hard time thinking about this. Everyone agrees that the restoration is the medication. I mean, pretty much. I mean, the testimony at the last hearing was the way you restore somebody to competency who has schizophrenia and serious depression is you medicate them. So there doesn't seem to be any independent treatment particularly. Because the medical center's position is that other treatment is of no use essentially. Well, I respectfully disagree in one aspect, and this comes from the testimony of Dr. Pites at the September 28th hearing. She testified that beyond the drugs themselves, she was going to have to do things with Mr. Loffner to test his competency, to see if she could get him to competency that he has a right to be free from. My understanding is that was to test his competency, that at some point she would go through a formal competency evaluation. That's to test his competency. But in terms of treatment, I didn't see any indication of treatment other than the drugs, from which I back up and say, well, since the district court had to decide whether he was going to be restored to competency, and the only way he was going to be restored to competency was by having involuntary medication, why don't the two issues collapse into each other such that the district judge at least has to determine that for the period he's going to be committed, it was appropriate for him to continue to get the medication for dangerousness. Because if he doesn't get the medication for dangerousness, he's not going to be restored to competency. Unless we have another hearing, a cell hearing, allowing him to be directly restored to competency. There's no question that the medication is necessary, but the question is whether it's sufficient for the prison to come back and say at some point, Mr. Loffner is competent. And for the prison to come back and say that Mr. Loffner is competent, they will have to do things such as present, Dr. Pipes testified about having to present to him a surveillance video from the offense that he believes has been edited. A video that has caused Mr. Loffner emotional distress. But whether he's there or whether he's back in Tucson and having the same medication, they could do the same thing. I don't understand why that's a problem. The goal for the commitment is the restoration to competency. If Mr. Loffner was in Tucson being medicated, he wouldn't have his liberty interest intruded by someone trying to make him competent. I'm sorry, I'm really not following that at all. If he's taking the same medication under the same circumstances, and this medication, it turns out, makes him competent, somebody's going to turn around at some point and say, oh, now you seem competent. Let's give you a test to see if you're competent. I don't understand what the difference is. Well, it's my position that there is a difference because during the competency procedures, he will be uncomfortably challenged by the doctors because they are trying to determine whether they can restore him to competency. If the government wants to civilly commit him and the government gains a treatment right, which we don't believe they have gained yet here in this pretrial context, and the medications at some point render him competent and not dangerous and he's released to society, the government can bring him in and try him. You said a little while ago there's no doubt that he has to be medicated. If there is no doubt that he has to be medicated, then why do we have to have another hearing? Let's roll to September 15th and termination. Well, I think the prison has said that he needs to be medicated. It's necessary to get the competency. I don't want to lose the point that the antipsychotics do not seem to be justified on dangerous grounds in this case. And if the antipsychotics are not justified on dangerous grounds, as the hearing has now made evident, then without the antipsychotics, any commitment for restoration would be completely... Are you suggesting, counsel, that he was not a danger because of his schizophrenia? He was not a danger to himself or to others? I'm not suggesting that. His treating psychologist at the prison testified that Mr. Loeffner, the source of his danger is not his schizophrenia, but instead... That doesn't mean that if they took away the antipsychotics and he returned to his schizophrenia that he wouldn't be a danger to himself. In other words, they may be maintaining him in a nonpsychotic state. But I didn't see anything that Dr. Pyte said that suggested that if they took him off of the antipsychotics, that he wouldn't be a danger to himself. Well, the fact that he may not be suffering from schizophrenia as severely as he was a couple of months ago, and that now the depression has kicked in, and that he may be a greater danger to himself because of the depression, doesn't mean that he still doesn't suffer from schizophrenia that needs to be controlled. Okay. It's an important point to, even under the Harper analysis, recognize that the only mental illness that can be treated on dangerousness grounds is the mental illness that is causing the dangerousness. Nowhere in Harper did the Supreme Court suggest that a prison can forcefully treat a mental illness that is not the source of the danger. And certainly under the Riggins standard that we have articulated, the medication must be essential to mitigating the danger. In this case, it's not just the presence of schizophrenia, which we argue the government has not obtained the right to treat. The government has the right to try to address safety concerns. And if there is an approach, if there is a means that is essential to mitigating safety, then they can employ that means. But the antipsychotics that they're administering to Mr. Loeffner, while that might be making his psychosis better, are not, number one, making him less dangerous, and the record indicates that, in fact, they may actually be exacerbating his dangerousness. Dr. Pites testified... Well, there are various... With regard to the danger to self, the danger to others just seems to be sort of advocated at this point, I guess. I mean, do you agree with that? Well, the operative order is the danger to self. So with regard to danger to self, First of all, do you have any understanding or concerns about the time-limitedness of that determination? I mean, maybe this is what you're saying, but there doesn't seem to be any notion that at some point he won't... There's reviews to determine whether that dangerousness to self has gone away such that he doesn't need the antipsychotic drugs anymore. Yes, and it appears from the CFR that there is a review process. Well, there used to be. I'm not sure it's in there anymore. Well, I would have to look at the .46. But I do know this. Dr. Pites testified that she believes it's a lifelong need. So what has been made of the lifelong... One of the problems we've got is she's the psychologist. She's not the treating psychiatrist who did the prescription. I'm not sure what she said is the full story. Can we rely just on her? Can we rely just on Dr. Pite, who's the psychologist, and not the treating psychiatrist? Well, for two reasons you can. Dr. Pite, as a psychologist, is able... or presumably a psychologist will identify a mental illness and its symptoms. But your position earlier is that the absence of the treating psychiatrist was all important. Now you're saying it isn't. No, with respect to side effects. And that's what I want to clarify. Dr. Pites has testified that the mental condition that is the source of his danger is depression, not schizophrenia. I mean, as Judge Bybee noted, she said, as I understand it, that that's true now, presumably because the psychosis has somewhat alleviated. She didn't say it was always true. And as I was about to say before, he has two sources of danger. One of them is he might kill himself. That seems to be, at least now, connected to the depression. But these other things he was doing at the time, which was not sleeping, not eating, not taking care of himself, defecating and all this, which no one has said was caused, at least solely, by the depression. Well, let's look at Dr. Pites' testimony. At 82 through 83, she recites the reasons why Mr. Loeffner was forcefully medicated on July 18th to include the pacing, not sleeping, the infection that happened to his leg because of the pacing, the hygiene issue, and sobbing uncontrollably, telling staff that he wanted to die, that he wanted to commit suicide. The pacing seems to be the source of the grave disability finding, because as Mr. Loeffner paced and his infection grew worse, there was concern that there could be very serious medical issues. So when Dr. Pites was questioned about the pacing, one of the questions on 195 is, Dr. Sarazin and you have concluded that the pacing is not related to the medication answer. Dr. Sarazin has concluded that it is not a side effect of the medication. It's due to agitation. Dr. Sarazin wasn't even there, as you point out. Well, at this hearing, the court accepted the testimony of Dr. Pites, who indicated that she had had several conversations with Dr. Sarazin. I mean, it can't be one way that if he said something good to her that helps make the government's case that it can't be considered here. I mean, this is an evidentiary hearing. But what's interesting are two things. First, she was asked point blank, is the agitation that's causing the pacing, that's causing the infection, that leads to grave disability, is it the schizophrenia? And she said, no, I don't believe that's part of the schizophrenia. I think it's his depression. He's obsessing, ruminating about the events in his life, what he believes his life is going to be, and that's created the anxiety for him. And she testified on this point. She testified on this point that Dr. Sarazin shares the same belief. We've talked about that. We'll give her some more time later. First of all, what do we know about the actual medical treatment plan as of the time of the recommitment? There's some statement with regard to the September 15th hearing that there's an attached plan, but I didn't see the plan. I don't know where it is. And other than that, what do we know? Well, it didn't even say it was attached. It said there was a treatment plan in Mr. Lofner's records somewhere. What we do know from the September 15th forced medication report is a list of the drugs that he was currently taking at that time. And that's sufficient for both the forced medication justification of medical necessity as well as the commitment, because while there's specificity as to what Mr. Lofner is taking at that minute on September 15th, there's no limitation on what the prison can do. In fact, we know that if Mr. Lofner today, as I'm speaking, refused to take his oral risperidone, that the prison has an intramuscular backup of Haldol that they will inject into him. None of that was taken into consideration by the court at the September 25th hearing. But then the court said, well, implicit in what I decided was that it's what they're doing now with minor changes. Okay. And if we can hold the court to that, if that, in fact, indeed was an order to the prison, which it wasn't, because his commitment order, both his oral order and the order that committed Mr. Lofner, didn't say anything about that. This is a stay order that came out later when the judge was explaining what his – how he saw the ruling. So to the extent that there is anything in that that would be binding on the prison, there's still problems. Minor changes in medication, even a one milligram change of risperidone, and I'm relying on the prison's own documents, even one milligram difference over the six milligrams he's getting a day can cause drastic changes in the possibility of side effects that Mr. Lofner could suffer. Indeed, the Bureau of Prisons' own clinical practice guide says risperidone given in amounts more than six milligrams a day will lead to the rates of extrapyramidal side effects that are common in the first generation drugs, such as Haldol. So here we have the court saying it's just going to be minor changes, but minor changes can have grave consequences for an individual. And moreover, minor changes doesn't give the prison any notion of how far they can go. All right. And two other related questions. First of all, you, that is Mr. Lofner's lawyers, didn't put on any witnesses at the September 28th hearing. Have you ever had him independently evaluated by a psychiatrist? Do you want to? Was that something that would happen if there were a larger, a more complete hearing that was developed, that was permitted? Yes. I mean, obviously in this case we've never had the opportunity, as far as the forced medication goes, to have any sort of hearing other than the judge to say it wasn't arbitrary. There was some basis. But why couldn't you have asked for an independent psychiatric evaluation before the recommitment hearing? Did you do that? An independent evaluation for dangerousness from the court? Well, for whatever. For dangerousness, for competency, for likelihood of restoration of competency, for whether it's depression or schizophrenia that was causing the dangerousness, et cetera. Did you ever attempt to, I mean, did you attempt and were denied the ability to have an independent psychiatrist? Or what happened? The court can't forget that the first time we were able to question a witness was at the September 28th hearing. The first time we learned that the prison, the first time that it was unbundled, what is said with absolute, utter unspecificity in the medication order, came to light at a hearing. That's why we have argued all along. You didn't know what medications he was getting before that? We knew what medications he was getting. Okay. And you didn't know the diagnosis? Well, we had a diagnosis in the competency report. Because we heard this case argued in August. And as I recall, in August, we knew some of these things then. So why didn't you request an opportunity to have him evaluated independently? Or did you? We never requested from the court an opportunity. Okay. Why didn't you? Because the burden is on the government to establish the necessity. Did you offer any proof to the district court that there was any medical reason to question the medications or the amounts of medications that were being offered by the prison doctors? That's exactly what we would do, Your Honor, in a hearing where we were given the opportunity to present witnesses and to put on evidence. That's what we've been requesting from the very beginning. But were you denied an opportunity to bring witnesses to the hearing before the district court? We were. In the June hearing, the court ---- Not the June hearing. The September hearing. But, Your Honor, I just want to give the context. We have requested to have an evidentiary hearing on the forced medication of Mr. Loffner. The district court denied it in June and has consistently maintained the same position through the August 25th challenge, the challenge to the emergency medication on July 18th and now to this challenge. Your position is that the district court, in the September 28th hearing, did not regard himself as deciding on the involuntary medication. That wasn't the issue there. That was not the issue of the hearing. He did make a ruling on our motion to stay on involuntary medication at the conclusion of the hearing when we brought up that that motion was still pending. Now, the first page of the district court's October 3rd hearing says the defense called no witnesses. Now, when I read that, that makes me think that the defense had the opportunity to call witnesses if it wished. As I explained to Judge Berzon, Your Honor, that hearing, the reason those witnesses were called were for the purpose of the government trying to establish that Mr. Loffner was sufficiently ---- had sufficiently improved to warrant further commitment for restoration. That hearing, those witnesses were not for the purpose of forced medication. The court had never allowed us that opportunity. In fact, he had denied us that opportunity in the very first instance that we challenged the forced medication and has renewed that ruling in each instance. So I don't think we could have forecasted or known. Right, but you knew that the government was going to argue under cell that the opportunity, that the fact that they were medicating him because he was dangerous would preclude the need for a separate cell hearing. You knew that that was the government's position, and it was largely the position that the district court concluded as well. So this was going to be your opportunity to contest both dangerousness and the restorative problem, confidence problem. Actually, the court deferred on that question and asked for a briefing on the issue of what he needs to do next. After that hearing ---- No, that was just a legal briefing on cell. But you knew going in, at least, that this was the government's position, that this is what you were going to get, and you didn't present any witnesses. We knew going into the hearing exactly what the court told us the hearing was about, and it was to determine whether there was a substantial probability that Mr. Loffram would be restored to confidence. But why doesn't that depend on whether he was going to continue to be medicated for dangerousness? In other words, if he wasn't going to be continued to be medicated for dangerousness, then he wasn't going to be restored to competency, or at least that was a pretty good argument. That's correct. But we had no idea that the situation was ---- because we have not been provided with anything more than medications are virtually certain to result in his deteriorating condition. Okay. So exactly what is it, if you could write an order right now for this court, what is it you want? We would write an order reversing the district court's stay, ordering the Bureau of Prisons to provide to the court a plan forthwith of how they will titrate the medication, for the court to forthwith hold a hearing to determine and to consider the appropriateness of that plan, and to the extent that the government intends to seek to forcefully administer antipsychotics to Mr. Loffram, it should hold a judicial hearing, an adversarial hearing, where the government proves by clear and convincing evidence that the medication is essential, considering less intrusive means to mitigating the danger. On dangerousness. On dangerousness. So when the judge said finally that you never really asked for a cell hearing, is that right? A cell hearing is what the government asks when they want the court to authorize the treatment of an individual with forced medication. The defense would never ask that. Mr. Loffram says I don't want it. But you're not saying this is tantamount to that. You've never said we should have a cell hearing now because this is tantamount to that. What we have said is if the forced medication is justified under the standard I just asked the court to write the order for. If that's the case, then it's the commitment to competency restoration that will incorporate almost every single aspect of cell, because of the Jackson interest to be free from unwanted commitment that will not result in a fair trial. So I misunderstood you. I thought you said that you wanted another Harper hearing, and that surprised me. But you're not talking about that. You can call it what we want, but you want cell. What Mr. Loffram wants is to not be forcefully medicated. If the government wants to do it on dangerousness grounds, then we believe the appropriate vehicle is what we would call the Riggins hearing or the Loffner hearing, the hearing that would be a judicial proceeding applying the Riggins standard. Are you going to take the position that any of the statutes or the regulations are unconstitutional? You have it yet, but I'm just trying to figure what's coming up next. Well, certainly 4241 D-2A, as far as the capacity argument goes, to read it any other way than to include the predictive analysis of the fair trial interest would be constitutionally infirm under Jackson. Didn't the district court say he did that? I know he said it later, but he did later say he did that. What did he say? What he said exactly was, and let me get it because I want to make sure. Something like, well, of course, it had to include, it had to be capable and appear capable. That's what he said. Implicit in the court's oral recital of its findings was the recognition that the defendant must be and must appear to be able to grasp the proceedings and to assist his counsel in his defense. As we noted in our briefing, the court has not given adequate consideration to the demeanor of a person who is suffering the side effects that Mr. Loffram is suffering. This isn't just Justice Kennedy's concurrence in Riggins. From 142 to 145 in Riggins, Justice Kennedy addresses two concerns, whether side effects will affect your ability to assist counsel, and even more troubling. If it's true that Mr. Loffram even appears to be able to grasp the proceedings, as the district court said in its oral ruling, it looks like he's paying attention. It is even worse and even more prejudicial if the side effects of those drugs prohibit him from being able to express himself appropriately at trial, being able to express emotions appropriately at trial. And that was what the flat affect was all about. It's a significant concern, and I know I've gone way over time. So why don't we... Do you have any questions? Any more questions? Okay. We'll give you about three or four minutes to refile. Thank you. Good afternoon, Your Honor. May it please the Court? I'm Chris Cavanius with the District of Arizona. I'd like to just start out by saying that the district court acted appropriately when it continued to find that the Harper medication was appropriate without a full-blown judicial hearing under cell. The court has issued several orders. I know the court's well aware of the transcript and the orders. I don't want to retread over that. But the bottom line is I'd like to just perhaps go ahead and answer some of the questions the court asked. Judge Beide, you asked whether they had the opportunity to present witnesses. They did. They did present no witnesses. Well, what was the hearing about? I mean, what I find, and I said this before, but where I find this whole issue very difficult is that the district, the government's position, as I understand it, has been, and I can't quite tell how much the district court agreed with it, that this hearing was not about forced medication. It was about the likelihood of restoring him to competency. And it was about the likelihood of restoring him to competency with, as I understand it, the dangerousness determination and the consequence of medication being kind of a background fact. The parties were aware that the court was going to entertain both issues that day, the question of whether the Harper medication continues to be appropriate, the September 15th challenge, and whether or not his commitment should be extended. Right. But the understanding was that if it was appropriate on the standard that he had previously applied. The Harper? The Harper. That there wasn't going to be a judicial hearing about the dangerousness question, because he was asked to the commitment proceeding, even though there was going to be a hearing on the commitment proceeding, that in the commitment proceeding, the issue was going to assume the, if it were otherwise upheld, the, as I understand it, both the Harper determination and its infinite continuation, i.e., that he would be medicated for dangerousness infinitely, or at least through the period of his commitment. That seemed to be an assumption, although it wasn't really ever gone into. I guess I'd ask the court to keep it separate in the sense that we had a motion that was made to challenge the Harper determination, continuing to argue that you have to have a cell hearing. We have the district court at the November 28th hearing finding yet again that the, I'm sorry, September, thank you, September 28th hearing that Harper allows the Bureau of Prisons to medicate the defendant based on his dangerousness. The same hearing, he's taking testimony from Dr. Pites and Dr. Ballinger. But as to that hearing, the involuntary, in other words, the question is, if the defendant had tried to put on evidence about the, as to the commitment question, as to the propriety of the involuntary medication, presumably he wouldn't have been allowed to do so, because you kept insisting, and I think the government, the district court was agreeing, that that wasn't what the hearing was about. I guess I'd say, Your Honor, there's so much of what the defense is arguing that bleeds into both. Do you know what I mean? If you look at the pleadings, there's an argument there has to be a treatment plan with regard to not only the extension, 4241B, but also a treatment plan with regard to the medication. There not only has to be cell followed with regard to the extension. Is there a treatment plan with regard to the commitment, or does there have to be one? Well, no. I mean, when it comes down to it, we have the district court considering his medication, considering what medication he's on, considering what side effects he's presented, how it's improved him over the course of time. And so the court did say it did consider side effects. But didn't he say at one point we're not considering medical appropriateness? No, I think that what he, I think what you have at that particular moment where the defense is asked to, where the questioning got to, you know, whether or not schizophrenia is like a bacterial infection or whatnot, the court's like, hey, we're a little off track, not sure I'm totally, you know, seeing where this is going. But if you look at the court's order, the court is saying that it did consider the side effects that were presented by the medication. And, of course, Dr. Ballinger's testimony was about that. And some of that relates, again, to the defendant's arguments inserting this fair trial stuff from cell into these concepts that, frankly, are different. That's the problem with the importation of cell that they request and why the district court properly found, again, last week. So what is the district court supposed to be deciding in a circumstance in which the, it has, do you agree that absent the involuntary medication the recommitment would have had to be denied? Because there's no possibility, everybody testified there's no possibility he's going to be restored to competency without medication and he wasn't going to take the medication. I guess I would say that because they had the right to medicate him, the medication... That's not what I asked you. I'm sorry. I asked you absent a valid medication order. I thought Dr. Price's testimony was that the medication was the cause or the reason that he is improving and would, therefore, make its way to competency. I think that's a fair... So we need to know, for example, whether he, which the district court never addressed, whether he would continue to be, there is going to continue to be justification to medicate him for dangerousness? The district court never addressed that issue. We sort of assumed that he was going to be medicated for the entire period, but they never addressed it. Well, Your Honor, I think that the record shows that without the medication he revert back to being a danger to himself. That's the essence of the Harper determination on September 15th. And one very, very important fact here. They're relying on a sliver of Dr. Price's testimony, which I believe both Judge Wallace and Judge Bybee touched on. Number one, that's not the only record. We have the psychiatrist's testimony from September 15th. September 15th, we have Dr. Tomilary specifically finding that as a result of his mental illness, and I'm at ER 656 under the findings, as a result of a mental disease or defect, and within the correctional setting, the patient is dangerous to self. So there is a specific finding that it is his mental illness that is the cause of his danger in the prison setting. Is there any periodic review of this? Is anybody ever going to look at it again? I mean, because all he had at that point, as I understand it, it was what happened in July. But did anybody ever consider anything after that? Actually, he did. Any notion about when you stopped medicating, if ever you stopped medicating for that purpose? He had more than that, because he talks about not only, you know, his progress. He talks about what Mr. Lofner was like on the 25th of August, as well as what he was like during that particular hearing. So he wasn't just relying on what happened on July 18th, although that gave the prison a very good indication of what would happen if the medication was taken away. But of course, see, what's very odd about this is that that set of behaviors did not exist at the time he came to the prison, to the medical facility. It all happened when they took him off the medication. But I guess that's the point, that if you take the medication away, this is what happens when you take the medication away. Wouldn't it happen if you didn't give it to him in the first place? But, Your Honor, I guess all they can do is confront what they are confronted with. They had the right, we would submit on June 14th, to medicate him as a danger to others. That's the argument we've made in the first appeal. We stick by that. That was entirely legitimate under Harper. Suppose we thought that was wrong. I'm sorry? Suppose that piece we thought was not supported was arbitrary. Does anything turn on that now? Well, practically speaking, no, because this Court stayed that medication decision, so it hasn't been operative since July 2nd. The medication that's occurring, to quote the defendant in his opening brief at page 7, is that September 15th is the presently operative medication decision. I'd like to add, too, that the Court asked whether or not we need to sort of have Sell and Harper, I think the phrase you used was sort of collapse into each other. Hernandez-Vazquez, at the very end of Hernandez-Vazquez, page 919, it reminds the District Court to remain mindful of the Supreme Court's distinction between the purposes of Harper meds and Sell meds. It should take care to separate the Sell inquiry from the Harper dangerousness inquiry and not allow the inquiries to collapse into each other. So that's exactly what the District Court noted last week more specifically, but Turow has recognized that Sell is supposed to be separate. But is there any case like this in which there was a commitment proceeding which assumed a Harper hearing but did not go into it? In other words, in Sell itself, my understanding is the posture was the same as this case was originally, i.e., he was already in the medical facility for a four-month period and then they went to involuntarily medicate him. But here we're having a proceeding about whether he can be committed. The only way he can be committed is if he's involuntarily medicated, because if he isn't, he's not going to get restored. And you just leave that determination of him being involuntarily medicated hanging out there where he wouldn't even be in that facility if he weren't being involuntarily medicated? Well, Your Honor, I think it comes down to the medication is a separate question from the commitment. And it doesn't matter where he is? Are the medication decisions not somewhat context-dependent? Well, they are to the extent that if the prison finds that he's supposed to be medicated or he should be medicated as a danger, that's the context, that's the Harper context, and that allows his medication. Rivera-Guerrero, by the way, I was reminded just recently, it relates to this question. You know, Rivera-Guerrero was a Sell order and then it was appealed. And in the pendency of that appeal, the defendant became medicated under Harper. And I'm looking at pages 1143 of 44. And in that Rivera-Guerrero case, this court noted that, you know, since the time of the Sell medication order, things had changed and he was now being medicated based on dangerousness. And the court said, quote, Accordingly, on remand, conducting a Sell inquiry no longer constitutes the appropriate procedure. So the court is recognizing that Harper and Sell are different, and that Harper allows the medication. It goes on. It talks about 4241D in Rivera-Guerrero. This court may recall the court below relied on Rivera-Guerrero in finding that the standard was whether he was likely to attain competency within a reasonable time. So the court goes on, talks about 4241D. And he had been committed for almost two years, and the medical center had treated him with antipsychotic medication for approximately one year until the court's decision. Now, the court didn't say, Now we have to go to Sell. The court said, Okay, we'd like to have the federal medical FMC Springfield let us know whether or not they think the medication now has made him competent. And that's at page 1144. And they say, If they report that he's been rendered competent and the district court agrees, then he can go ahead and be tried. So I think Rivera-Guerrero stands for two very important points. Number one, you separate Harper from Sell. That's clear. But that Harper-based medication can incidentally restore someone to competency, and you don't have to have it done here. I mean, in fact, it's not incidental. I mean, to call it incidental is really to put one's head in the sand in the sense that he is in that facility to be restored for competency. If he wasn't being restored for competency, he wouldn't be there. So clearly the doctors involved have at least conflicting interests or maybe they're unitary interests, but they're all towards restoring him to competency. And so to create this division under those circumstances and moreover under a circumstance where you're making a commitment decision that assumes the involuntary medication, has to assume it. Well, again, medication being separate from commitment, the fact that he is being committed for an additional four months to see whether he can be restored does not alter that his medication is justified under Harper and that that's the ground for the medication. You do not need to then move to Sell. One of the things we argued in our response and that the district court noted in its order last week is that it's only if you're being medicated solely to restore competency do you have a Sell medication order. If there's Harper medication justification... Well, Harper, of course, was somebody in a prison, already convicted, who had no liberty interest in not being... He had a liberty interest in not having involuntary medication, but he didn't have a liberty interest in not being, quote, fixed because he was in a prison to be fixed, to be improved. So he didn't have that liberty interest and it was permanent. So here we have somebody who is theoretically temporary. And, I mean, this goes back to what the subject of our first case was, but still you're making a set of assumptions about a completely unitary world in which there's Harper and there's Sell and there's nothing in between, whereas what we have here is necessarily in between, isn't it? For a bunch of reasons. No, actually, I mean, again, I guess I would turn the court to Rivera-Guerrero. I mean, if he is being medicated under Harper in that case, the court did not then say, okay, now we turn to Sell. As a matter of fact, sit on remand, conducting a Sell inquiry no longer costs you... Because he was already... If he was already restored to competence. But that's the point, that you can have Harper medication that restores someone to competency, but it does not then trigger the need for a Sell determination. Rivera-Guerrero didn't say that it was all okay to do it that way in the first place. It just said it's already done. Well, I guess in the event the court... If there had been any kind of a question about the propriety of that, I guess I would say the absence... I guess maybe my response would be just the language speaks for itself, and I know the court's able to see what it says. When it comes down to some of the other points the defendant made in his reply brief, could I address just a couple of those in the time that I have? This question about Dr. Pintz and whether she found that depression is the cause of his dangerousness, again, she never testified to that. I mean, Judge Biden, you had asked some questions or it sounded like you were aware of... The big picture here is that it's the schizophrenia that is the root cause of the dangerousness in the prison setting. That is something that Dr. Tom O'Leary found as well. And overall, the medication is improving him, not hurting him. And so I think, again, the evidence itself demonstrates that. There's a claim, I think, Judge Berzon, you just mentioned, something about BOP being biased, or at least their goal is toward restoration, so that they were just going to be single-minded in this effort. And the district court... And it's not to implicate their bona fides. It's just to say that they are not objective outside people in this circumstance. I think the district court, though, has spoken to that, Your Honour, in the latest order, I think, as well. Well, first, we mentioned a couple of places in our answering brief. In the last appeal, pages 44 to 45, where the district court... The district court made a finding on the issue. I'm sorry? The district court made a finding on the issue in the last order. Yes, right. Isn't that your argument? Yes, and that's what I was giving the reference for. I apologize, it was a little slow. The last cell order also, footnote 3, the court notes that the Bureau of Prisons doesn't have to find him competent. The Bureau of Prisons remains free to say he's not after four months. And that's the essence of... But they're not willing not to try to make him competent, because that's what he's there for. In fact, it says that he's committed for treatment and for restoration of competence. So they may be free not to find him competent, but they're not free not to try to make him competent. I guess I would say, Your Honour, that the district court made findings on this, as well, recognizing that if BOP wanted to basically grease his skids to get him to trial, Dr. Pites would not have found him incompetent initially. And, of course, now we have September 28th, where she comes in and says, you know, he's getting close, but he's not there yet. I mean, if BOP wanted to really help, I guess, this along and was so single-minded in trying to get him restored... That's not the point. But they do have an obligation to treat him towards competence. That is what he's there for. That's what their mission is, what their duty is. To the extent that the question suggests that BOP is not being impartial in this, then I would just, you know, again, point you to the district court's findings. Put note three. Put note three, yeah, in the cell order last week. Which says what? It says that they don't have to find him competent, but it doesn't say they don't have to try to make him competent. When it comes to the medical appropriateness, for the first time in the reply brief now, we're getting an argument that the risperidone or the medication that he's being specifically given is not medically appropriate. Now, again, down below, there was no argument that the medication was not appropriate. As a matter of fact, the district court in his order from September 3rd, I'm sorry, October 3rd, page five, notes that there was no evidence that the regimen was improper. And, of course, we have Dr. Ballinger saying it's highly appropriate. From the beginning, from the first beginning of the medication, the regime has changed enormously. Isn't that right? Not hugely. I thought they began with one milligram of the risperidone, is that what you call it? Risperidone. Up to six. And they say they may give him more after that. And they've changed exactly what the other various other medications are, and they've added some. I mean, it's been quite a fair number of changes, no? Not large changes, Your Honor. And I guess I would defer to, again, the district court's finding that he's considering the medication. He knows what the doses are. He knows what the dosages are. The defendant, the testimony was that the risperidone, again, it's the antipsychotic that's really an issue here under Harper, that it's produced, you know, the serious side effects that you saw in Justice Kennedy's concurrence in Riggins, it's just wholly separate, and that's what Dr. Ballinger's testimony just really elucidated. It's just how different, and the likelihood of side effects here, even getting to the trial point. And that brings me back to Judge Wallace. He'd ask, wouldn't it be a better thing to do is wait until we get to trial or the competency hearing and reassess at that point? Yes. That's exactly the district court's point. Is that the government's position? Is that the government's position that if this medication continues and he's competent to go to trial, but he is not competent to assist his lawyer, that the government wouldn't be able to try him for these murder cases, murder trials? In the event the district court was to find him not competent. I said not competent to assist his attorney for trial. Competent for trial, but cannot, he knows the difference between right and wrong, but he cannot, due to the side effects, effectively assist his attorney in the trial, violating the due process argument, due process. And I understand the competency test itself requires that the defendant be competent to assist his attorney. So I think that's part of the competency test. Well, that's separated in a lot of the opinions, and it certainly was in SEL. And we're talking about the SEL problem. And so my question to you is, if the government is successful in making him competent so he understands the difference between right and wrong and he can be tried, but the side effects, as referred to in Justice Kennedy's concurrence, are such that he cannot assist his lawyer, and the rest of it I don't understand what he said. But in assisting a lawyer, that's fundamental to a trial. If the side effects have caused that, then would not the government be in a position they could not try him? I want to, before I answer that definitively, I want to go back and reread some of that competency authority. So all I would say is, when it comes down to it, though, the court said it would always leave the door open to whether or not there were side effects or things that might affect the defendant. But also the court noted, even if he looked tired here and there, the court also noted it could take breaks and do other things. Well, I understand that. You don't want to take a position on behalf of the government, but I think the court, you can read into him, says that he's leaving it open, and I can't imagine any reason to leave it open other than if through this treatment, the side effects prevent him from assisting his lawyer effectively in a case such as this, that the government wouldn't be in a position to take it to trial. Well, I guess I would say, again, Your Honor, I'm going to make sure I check that law very carefully. Call Washington. Let me ask you a question that bothers me. If I could just use your last 48 seconds here. Sure. I think the key to this case, at least as of now though I change my mind, the key to this case is what occurs at the time of the extension. That is, up until that time, the government has chosen to keep him confined and give him involuntary medication on the basis of making a determination of whether or not there is a chance of restoring him to competency to try the case. That's the first four months. The government did not make a civil commitment. The government had no authority to make those types of medication except what it did. Now there's a changeover that takes place at the time where that first four months is no longer effective because the prison has now made its determination that it's substantially probable that he can be made well to try. So we're not now in that. We're in something entirely new. Your argument is, but he's still dangerous, so we have to give the dangerous drugs. But that's not the point. I understand that. The point is, is the setting different when you have to do some type of cell analysis because you're moving into something new? Now I haven't made up my mind on that issue. I keep changing my mind on that issue. But it seems to me that you should be able to convince us that you can continue the same type of dangerousness approach during the time you're looking to see if he can be made competent for trial, that there isn't a need for a new hearing that may include the cell type of approach at that junction when you move over. I think that's the real issue. And, Your Honor, I guess I would say that the answer is no, you do not move to a cell hearing, even though we are now at the period where he has been committed for that additional time. Let's assume that a line is cut there and you're going to take a new look of why it should be able to continue on with that medication. What's your argument? The reason it doesn't change is based on what Cell itself said, which is you only have to require cell-based medication when it is solely the reason. It's solely the reason to restore his competency. If you have the medication based on dangerousness, you do not have a cell order. Is the medication-based... When I said earlier that it was context-specific, I guess my question is, does an order that he is dangerous to himself when he's in this medical facility... If he were to leave it and go to the Tucson prison, does it carry over, or does he have to... There has to be a determination as to that location. I don't know the answer, other than it makes me think that... I mean, whatever the justification is that allows them to medicate would endure. But if it's... I mean, what... That depends in part on what the circumstances in which he's being held are, right? Well, no, because if he's in custody and he's in the prison and he poses a danger, they're allowed to... And he's mentally ill, they're allowed to medicate him. And what kind of circumstances he's held in and who's dealing with him and a whole bunch of other things, no? Danger to himself is what the issue is. But I guess I would say that wherever he's in custody, in the Bureau of Prisons or Jail or, you know, in federal custody, he's entitled to... Or I should say the prison is entitled to medicate him if he poses a danger to himself, and we know the record is replete by... Well, it's not replete. It's pretty short, actually, in terms of danger to himself. Well, I mean, if you take the meds away, I think the record is replete. Dr. Pites, Dr. Ballinger, Dr. Tomillary, Dr. Saracen, all finding that without the meds, he is a severe danger to himself. I didn't know that. Hmm? I didn't know that. Because based on the reasons that they put in the Harper determination, Dr. Pites testifying and Dr. Ballinger... Well, Dr. Pites testifying in her experience, what happened last time it was stopped, and Dr. Ballinger testifying based on his 40 years of experience. The thing in the record about how it was stopped, was it just stopped, called Turkey, and does that matter? You mean after... Right, I mean, it seems to me just... I'm not a doctor, I'm not a psychiatrist, but reading the record, it seems like he had this, you know, incredible changeover from how he was before. They meditated him from the supposed dangerousness to what happened afterwards. And from the little I know about psychotropic medications, it may have to do with how it was stopped. Has anybody ever looked into that? I think that we have to defer to the doctors on this, which is the reason that the Supreme Court's Harper decision that... Well, doctors have stopped it under an order. I suppose they would say we didn't... You know, if anybody ever asked them, they could easily say, we stopped them under an order, this is how we would have stopped it. Well, I guess that's the point, that the medication was stopped as a result of court order, and then they were faced with what occurred. And they had to act, and they did. And somebody knows whether that would continue to happen again, even though it had never happened before, if it were stopped in due course under sensible circumstances? That's where you have to defer to the medical professionals. But nobody's ever asked those questions. But, actually, they say specifically that if the medication is stopped, Dr Tomilleri said he's virtually certain to go back to what he was before. I mean, these are the medical findings. When's the before? Before what? Before he was medicated on July 18th? When he became a danger to himself, in that period when the medication was stopped and when he was medicated on July 18th. I want to go back to the point that I was making. There's a couple more questions I wanted to make, if you don't mind. He's going to be medicated up until the time, for the purpose of making a determination whether he can get well. He's going to be medicated after that point to get him well. So the purpose of the medicines is now different. Why wouldn't that trigger an entire new look requiring a cell analysis? Because it doesn't remove that the purpose is the dangerousness. You missed my point. It doesn't matter. Just set aside dangerousness. The basis of why he's in jail for the first four months is to make a determination. The basis upon which he will stay in jail is to make a different, that is, treatment. So why wouldn't you need a new Harper cell analysis? Why can you continue on when the circumstance, the purpose for the incarceration has changed? Because it's not the purpose of the incarceration that triggers the right for a Harper medication. It is being a danger to yourself or to others in a prison setting. So he continues to be... But we all know, I guess we all know from the record, that whatever he's getting during this first four months helped him from a psychiatric point of view. The doctors all say that. So we're talking about dangerousness, but it also has effect on the end result the government wants, is to get him prepared so he can be confident to try. And I don't know the answer to this. That's why I'm asking the question. Why shouldn't, when you change the basis upon which the person is incarcerated, why shouldn't that open up a new issue, that is, because he's going to move towards that process, that there should be something more than Harper. There should be Harper plus cell. I think that actually the law has answered that question. I don't think it's an open question. I think cell has answered that question in the sense that we don't even get to a cell inquiry. And remember, cell's a pretrial inquiry, so that gets to the whole question of whether it applies to a pretrial detainee. Harper does. Cell does. Cell was talking about... This is another side-by-side thing. But cell... I wonder if you could answer the question I'd like to hear. I was going to say that cell itself is a pretrial case. It says you do not get to cell medication orders unless he's being medicated solely to restore competency. Even if you could put two motives on top of this, which frankly I don't think you can, because even the district court at the hearing on 9-28 said he's being medicated for dangerousness. But cell itself says it's solely to restore competency. I think I raised not only Rivera-Guerrero, in another case there was Grape, a case where people are Harper medicated, but they are restored to competency through that process, but it does not alter that you don't have to have a cell hearing or cell finding because that kind of a medication order is only applicable if you don't have Harper. And we do. Actually, when it was talking about doing the Harper first, it was talking about the court doing it. It went on and on about that. In other words, it seemed to be saying that the purpose should be considered, but it wasn't saying that you then... in that context. And that context was more like our earlier context. It's not the context where you have, as Judge Wallace was saying, a new commitment for the purpose of restoration. But even so, it was still talking about a court hearing, and here there had to be a court hearing for the commitment purposes. So why do we have this truncated half a court hearing? What you have is Harper justified medication, which then allows the defendant to be medicated, and that's the only inquiry that applies, even though he has now been sent back for purposes of determining whether he can be restored. Not determining, for doing it. For doing it. And how are they doing it? By giving him this medication. But the medication justification is what we're talking about here. Do you have to do something different than what you've done? But if he was getting this medication, he'd have to get the medication because he has no business being there except to get the medication. Is that right? But he is getting the medication. But why is he there? I'm sorry? Why is he there? To get his competency restored, right? I guess all I can do is point the court to the cases, including this court's cases, Hernandez-Vazquez, Rivera-Guerrero cell, Maurice Gajula talks a little bit about that. But there is no case like this. Is there any case like this? There are cases where people have been Harper medicated, and I guess all I can do is just say that it really does seem black and white in the cases that if you have Harper medication justification, you do not have a cell medication order. Justification, yes, but the procedures don't necessarily go with it. There's a substantive component and there's a procedural component. Well, that gets back to what we argued originally, that there is no distinction for pretrial detainee in this context, that if you were in prison, you were in custody, and we cited also that... I see I'm out of time. Can I finish answering your question? You're way out of time. That's fine. Okay. I just wanted to add that, you know, just like that Bureau of Prisons regulation we noted in our answering brief this time that talks about how, I mean, the prison's interest in medicating a dangerous person, and let's not forget the big picture here. We can't have the prison running to court to medicate people who pose a danger in prison. That is the essence of the whole Harper determination, the whole Matthews versus Eldridge factors, and what kind of, you know, the Matthews versus Eldridge factors also talk about the usefulness of judicial review. I mean, here you have judicial review actually multiple times, but what you have is the court concurring that the Bureau of Prisons actions are appropriate, not arbitrary, that they're justified, and this record does support what the Bureau has done here. So all I can do is say that, you know, Harper does stand for that proposition they're entitled to medicate. CEL is very clear that you only have a CEL medication order if it is a... if it's solely to restore competency, which is not what we have here, and Rivera-Barrero and the other cases support that. Okay. Thank you very much. Thank you for your helpful argument. Thank you, Your Honor. And we will give you four minutes. Thank you, Your Honor. I want to return to the situation that seemed to trouble the district court, seems to trouble some members of this court, and that is what happens when we get to this point, where the individual is being committed for purposes of restoration. CEL didn't address that. In CEL, he was in the evaluative commitment period. And while CEL did state the language about a Harper purpose, it never said anything about the correct substantive standard being Harper. To the contrary, I agree with Your Honor, Judge Berzon, that CEL repeatedly says to the court, not only the court, but that the court will assess whether it is necessary to deal with the danger. But, Judge Wallace, to get back to your point, where does this fit? Where do we get these considerations when we know that we're committing someone for purposes of restoration and we know those drugs are being used? We've struggled with this question, but we find it in the capacity analysis of 4241 D-2A. It's there where all these other CEL factors necessarily are taken into account. CEL didn't consider Jackson. It certainly didn't overrule Jackson. In Jackson Vandience, before you can place someone in commitment for restoration, there has to be the substantial likelihood that they can have a fair trial. Do you agree that we'd have to do a lot of distinguishing of CEL and the Ninth Circuit cases? They seem to make flat statements, as counsel said. I'm troubled by that. It's not easy, Your Honor, but it's not foreclosed, and I think it's mandated. We have concerns. CEL stands in tension with Jackson, and we have the concerns that Justice Kennedy has announced in Riggins. It's not just whether you can assist counsel. Justice Kennedy's concerns, the other part, is that you have to have an individual who can sit at that table during a trial and react appropriately to trial testimony. CEL, that may or may not be what CEL has adopted. I've looked at all of the sites to Justice Kennedy that Justice Breyer made. One of them is C, which I know means, and there is a little bit in there, but almost every one of them is almost with Justice Breyer's, what he said, and then he makes a citation, has to do with assistance of counsel. There's one little flavor in there, and I give you that. Well, let me point to two more flavors. I'm not sure which one you're talking about, but at 185 in CEL, the court says, the failure to focus upon trial competence could well have mattered. Whether a particular drug will tend to sedate a defendant, interfere with communication with counsel, that's the first Kennedy concern, prevent rapid reactions to trial developments, or diminish the ability to express emotions, are matters important in determining the permissibility of medication to restore competence. That's the one. Okay, the others don't get you there. But I really... Say that. Well, let me posit this. In the part of CEL, the factor that... Let me just say that then he cites Kennedy, and he says, but not necessarily relevant when dangerousness is the primary issue. I'm sorry, and what page is that on? 185, 186. The part that you read to me there, sedate the defendant, interfere with communication with counsel, prevent rapid reaction to trial developments, or diminish the ability to express emotions. That's the only place in the citations I found where it said that. Are matters of importance in determining the permissibility of medication to restore competence, and he cites Kennedy. And he says, but not necessarily relevant when dangerousness is the primary issue. But not absolutely irrelevant. Yeah, but I have difficulty saying that that's, as your brief said, the law of the land. I'm not quite sure it's the law of the land. Yeah, maybe. If I could just take one moment to go back to the actual CEL factor of whether the means advance the government interest. They say you have to consider two things. Whether the means are substantially likely to result in competence, and substantially unlikely to render a trial unfair. Let me get the exact language. Substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense, thereby rendering the trial unfair. First, they don't just cite the part of Kennedy's concurrence that addresses assistance of counsel. They cite the entire concurrence that addresses the first reaction issue. I'll call it the ability to react at trial. But if you look at it, it doesn't make logical sense. You can't say that you have to determine whether someone's likely to become competent, and then say, and also determine whether they're substantially unlikely to not become competent. That would be the limitation that the government would have to read on this. One last question. Suppose we were to say, okay, you win. He can't be committed to, on the commitment issue. All right? And send him back to Tucson prison. And suppose they stop the medication tomorrow, and then the next day he began behaving like he did in July, and the next day after that they had another Harper hearing and they medicated him. Then where would we be with regard to this whole cell thing? Our position is even before you get to the D2 commitment, to the restoration commitment, that due process requires that the Riggins standard be applied by a court. I mean, I'm not saying that's your weakest argument. There is no Riggins standard. Riggins says there's no Riggins standard, so there is no Riggins standard. So, leaving that aside. The standard described in Riggins, which is the standard that I think CEL itself adopts the language of Riggins, it says on page 182, particular drugs are medically appropriate and necessary to control a patient's potentially dangerous behavior. I mean, that's what we're saying when we say Riggins standard. We're talking about essential to evade the dangerousness. Your answer would be, you go back to your first Harper hearing, but the whole question of, so it's not that you, but there wouldn't be any CEL implications at that point. It would be a Harper hearing. It would be a... Your version of a Harper hearing. Our version, yes. Our version of a dangerousness hearing. Let's put it that way. So, yes, it would be our version of a dangerousness hearing. If you didn't, you wouldn't want to go all the way back to Harper because that's an administrative process and we give a lot of deference there. It seems to me you're looking for something fresh, de novo, in front of the district court. Not the district court saying it met as it did before, but it met the administrative standard. I take it you're looking for something beyond that. That's absolutely correct, and that's the issue we bring. Okay, thank all of you, and thank you all for... Well done. ...a very difficult schedule and being incredibly useful in the arguments and the briefs and so on. Thank you very much. The case of United States v. Gloucester is submitted and we are adjourned.
judges: Wallace, Berzon, Bybee